**SHERWIN–WILLIAMS COMPANY; and National Paint and Coatings Association, Inc., Plaintiffs,**

v.

**Erin M. CROTTY, Commissioner of the New York State Department of Environmental Conservation; and Eliot L. Spitzer, Attorney General of the State of New York, Defendants.**

No. 1:04–CV–185.

United States District Court, N.D. New York.

Aug. 19, 2004.

Nixon, Peabody, LLP, Attorneys for Plaintiffs, Albany, NY, Richard M. Cogen, Esq., Sheri L. Moreno, Esq.

Hon. Eliot L. Spitzer, Attorney General of the State of New York, Attorney for Defendants, Department of Law, Albany, NY, John J. Sipos, Esq., Joseph S. Koczaja, Esq., Asst. Attorneys General, of Counsel.

### MEMORANDUM–DECISION and ORDER

HURD, District Judge.

## I. INTRODUCTION

Plaintiffs Sherwin–Williams Company and National Paint and Coatings Associa-

tion, Inc. ("plaintiffs") sued Erin Crotty ("Crotty") and Eliot Spitzer (collectively "defendants"), for violating the Clean Air Act (42 U.S.C. §§ 7401–7671q); Commerce Clause and Equal Protection Clause of the United States Constitution (U.S. Const. art. l, § 8, cl. 3; U.S. Const. amend. XIV, § 1), under 42 U.S.C. § 1983; and various state law claims. Specifically, plaintiffs contest defendants' creation and implementation of the Architectural and Industrial Maintenance Coatings regulations ("AIM Regulations") for the State of New York.

Defendants move to dismiss plaintiffs' Clean Air Act, § 1983, and state law claims for lack of subject matter jurisdiction pursuant to Fed.R.Civ.P. 12(b)(1). Defendants also move to dismiss plaintiffs' Commerce Clause, Equal Protection Clause and § 1983 claims for failure to state a claim for which relief can be granted pursuant to Fed.R.Civ.P. 12(b)(6). Plaintiffs oppose defendants' motions. Oral argument was heard on June 11, 2004, in Utica, New York. Decision was reserved.

## II. *BACKGROUND*

The background facts as set forth below are undisputed or not challenged by the parties as presenting any genuine issues of facts. While many of the following facts are not material to the disposition of the instant motions, the background is helpful to the legal analysis.

Ozone is a natural component of the Earth's atmosphere. It can also be created at ground level when, in the presence of heat and sunlight, a nitrogen oxide and volatile organic compounds chemically react with each other. Nitrogen oxides are most commonly emitted from automobiles and industries, and volatile organic compounds are released by chemical and petroleum industries, automobiles, and the use of solvents. *Virginia v. EPA*, 108 F.3d 1397, 1399–1400 (D.C.Cir.1997). Some geographic areas, such as the New York City metropolitan area, have particularly high levels of ground-level ozone, caused by higher levels of nitrogen oxides and volatile organic compound emissions. 40 C.F.R. § 52.1683 (2004).

Depending on its location within the atmosphere, ozone affects humans and the environment differently. When contained in the upper levels of the atmosphere (10–30 miles above ground level), it serves as a protective barrier, absorbing ultraviolet rays. *Virginia*, 108 F.3d at 1399. At ground level, ozone is problematic, causing respiratory difficulties, and damaging crops and ecosystems.[1]

In an effort to curb the increase in air pollutants, such as ground-level ozone, Congress enacted the Clean Air Act in 1963, after which it was significantly amended in 1970, 1977 and 1990. It remains the primary legislation used to "protect and enhance the quality of the Nation's air resources so as to promote the public health and welfare and the produc-

---

1. Short-term studies of ozone exposure have shown that "[m]uch of the ozone inhaled reacts with sensitive lung tissues, irritating and inflaming the lungs, and causing a host of short-term adverse health consequences including chest pains, shortness of breath, coughing, nausea, throat irritation, and increased susceptibility to respiratory infections.... [E]xcessive ozone can also damage forests and food crops." *Id.* at 1399–1400. In fact, several billions of dollars in crops are lost each year due to ground-level ozone, and "animal studies have demonstrated that repeated exposure to ozone for many months can produce permanent structural damage in the lungs and accelerate the rate of lung function loss, as well as the lung aging period." Final Rule on Ozone Transport Commission, 60 Fed.Reg. 4712, 4712–13 (January 24, 1995) (to be codified at 40 C.F.R. pts. 51, 52, 85).

tive capacity of its population." 42 U.S.C. § 7401.

The Clean Air Act's 1970 Amendments help to achieve this objective, by mandating that the Environmental Protection Agency ("EPA") both identify emissions that "cause or contribute to air pollution [and that] may reasonably be anticipated to endanger public health or welfare" and establish National Ambient Air Quality Standards ("Air Quality Standards") for those pollutants.[2] *Id.* §§ 7408(a)(1)(A), 7409. The first Air Quality Standards for ozone were developed in 1979, and established a maximum hourly concentration of ozone of 0.12 parts per million ("ppm") ("1–hour Air Quality Standards").[3] 40 C.F.R. § 50.9.

Preventing and controlling air pollution is primarily the responsibility of states and local governments. 42 U.S.C. § 7401(a)(3). The 1970 Amendments specifically require states to create, receive EPA approval of, and enforce state implementation plans to achieve the Air Quality Standards. 42 U.S.C. §§ 7407, 7401(a)(3), 7410. In developing their implementation plans, states can create stricter regulations than those set forth by the EPA. 42 U.S.C. § 7416; *Union Elec. Co. v. EPA,* 427 U.S. 246, 269, 96 S.Ct. 2518, 2531, 49 L.Ed.2d 474 (1976); *Train v. Natural Res. Def. Council,* 421 U.S. 60, 79, 95 S.Ct. 1470, 1482, 43 L.Ed.2d 731 (1975). State implementation plans for ozone typically focus on decreasing the level of ozone precursors in the atmosphere, such as nitrogen oxides and vola-

tile organic compound emissions. In the event that an area within a state fails to meet the Air Quality Standards, the EPA designates that area as non-attainment and requires the state to implement additional attainment measures. 42 U.S.C. § 7502.

The EPA has identified the New York City metropolitan area as a severe ozone non-attainment area because of its inability to meet the 1–hour Air Quality Standards for ozone. *Id.* Under the 1990 Amendments of the Clean Air Act, New York State is required to make "reasonable further progress" in decreasing ozone levels in the New York City metropolitan area and is required to gain approval of an ozone non-attainment state implementation plan from the EPA. 42 U.S.C. § 7511. The EPA specifically mandates that the New York City metropolitan area attain an approximate 4% reduction in ambient concentrations of ozone by the year 2007, and that the New York Department of Environmental Conservation ("DEC") work through the Northeast Ozone Transport Commission ("Northeast Commission") in developing their ozone control measures.

Following the EPA's non-attainment plan mandate, Crotty, acting in her official capacity as Commissioner of the DEC, assisted in the development of the Northeast Commission AIM Regulations for the Northeast Ozone Transport Region ("Northeast Region")[4] in December 1999. The goal of the Northeast Commission's AIM Regulations was for the Northeast

2. The EPA's Air Quality Standards are the maximum concentrations of air pollutants that are allowed in "the portion of the atmosphere, external to buildings, to which the general public has access." 50 C.F.R. § 50.1.

3. Although the EPA proposed an 8–hour Air Quality Standards for ozone in 2003 (calling for a maximum hourly concentration of ozone to be 0.08 ppm), 40 C.F.R. § 50. 10, the

disputed AIM Regulations apply the 1–hour Air Quality Standards for ozone.

4. The Northeast Region is composed of the following states: Connecticut, Delaware, the District of Columbia, Maine, Maryland, Massachusetts, New Hampshire, New Jersey, New York, Pennsylvania, Rhode Island, Virginia, and Vermont.

Region to achieve the 1–hour Air Quality Standards for ozone.

In June 2000, Crotty and officials from other states in the Northeast Region agreed to consider additional ozone control measures. These additional measures developed into the Northeast Commission AIM Model Rules. Crotty signed a Memorandum of Understanding on March 28, 2001, endorsing the Northeast Commission AIM Model Rules and agreeing to propose them in New York.

On March 19, 2003, the proposed AIM Regulations for the State of New York, which mirrored the Northeast Commission AIM Model Rules, were published in the New York State Register and the Environmental Notice Bulletin. The proposed regulations outlined how the state would limit the amount of volatile organic compounds that could be contained in 52 types of architectural and industrial maintenance coatings. There was one possible exemption included in the New York AIM Regulations. Small businesses (producing less than 3,000,000 gallons of product per year), with fewer financial and technical resources, would have the opportunity to show that they were unable to meet the regulations' requirements and apply for an exemption. Exemptions would be for one, three-year period with the possibility of a single, three-year extension. Those companies exempted would then be required to submit evidence to justify continuation of their exemptions, for each year of the exemption period. N.Y. Envtl. Conserv. Law §§ 1–0101, 3–0301, 19–0105, 19–0305 (2004).

Public hearings regarding the proposed New York AIM Regulations were held in August 2003, in Albany, Buffalo, and New York City. Written comments were also accepted by the DEC at that time. The DEC made an assessment of all the comments, and on September 25, 2003, the New York State Environmental Board approved the AIM Regulations. They were subsequently adopted and filed by the DEC on October 23, 2003. The AIM Regulations will take affect on January 1, 2005.

## III. *DISCUSSION*

### A. *Subject Matter Jurisdiction—Clean Air Act and Section 1983 Claims*

 Plaintiffs allege that jurisdiction exists over their Clean Air Act claims because defendants violated the Act's procedural provisions when they created the AIM Regulations, thereby establishing federal question jurisdiction.[5] Defendants contend that the savings clause cannot be utilized by plaintiffs because § 1983 protects federal rights conferred elsewhere and the Clean Air Act does not confer any federal rights. Defendants assert that even if the Clean Air Act did confer federal rights, it contains a comprehensive remedial scheme that precludes § 1983 claims. Plaintiffs counter this argument by claiming that their Clean Air Act claims arise under the Act's savings clause because defendants' violations of the procedural provisions constitute a violation of § 1983.

Federal question jurisdiction exists in "civil actions arising under the Constitu-

---

5. Plaintiffs first claim that defendants' are in violation of the Clean Air Act's procedural provisions because they did not consult with the EPA administrator regarding the New York State AIM Regulations. (Am. Compl.¶¶ 118–22.) Secondly, plaintiffs allege that Crotty was not obligated to create or implement the New York State AIM Regulations because the Northeast Commission's AIM Model Rules were not developed by the Northeast Commission or reviewed by the EPA and that the EPA administrator failed to allow public hearing on the Northeast Commission AIM Model Rule. *Id.* ¶¶ 123–31.

tion, laws or treaties of the United States." 28 U.S.C. § 1331; *see also Dinsey v. Dep't of Homeland Security–United States Citizenship & Immigration Servs.*, No. 03 Civ. 10081, 2004 WL 1698630, at *4 (S.D.N.Y. July 28, 2004). Accordingly, federal courts must dismiss cases where there is a "lack of jurisdiction over the subject matter." Fed.R.Civ.P. 12(b)(1).

■ In deciding whether a court has been granted the constitutional or statutory power to adjudicate a case, the "court can refer to evidence outside the pleadings and the plaintiff asserting subject matter jurisdiction has the burden of proving by a preponderance of the evidence that it exists." *Luckett v. Bure*, 290 F.3d 493, 496–97 (2d Cir.2002); *see Makarova v. United States*, 201 F.3d 110, 113 (2d Cir.2000); *Malik v. Meissner*, 82 F.3d 560, 562 (2d Cir.1996).

■ Under § 1983, a private cause of action can be brought against "persons who, under color of any statute, ordinance, regulation, custom, or usage, of any State or Territory, subjects, or causes to be subjected, any citizen of the United States or other person within the jurisdiction thereof to the deprivation of any rights, privileges, or immunities secured by the Constitution and laws." 42 U.S.C. § 1983. Section 1983 therefore serves as a procedural mechanism for "vindicating federal rights elsewhere conferred," *Baker v. McCollan*, 443 U.S. 137, 144 n. 3, 99 S.Ct. 2689, 2694, 61 L.Ed.2d 433 n. 3 (1979), and does not confer any federal rights itself. Where a statute contains a comprehensive remedial scheme, § 1983 claims are precluded. *Middlesex County Sewerage Auth. v. Nat'l Sea Clammers Ass'n*, 453 U.S. 1, 20, 101 S.Ct. 2615, 2626, 69 L.Ed.2d 435 (1981);

*Transamerica Mortg. Advisors, Inc. v. Lewis*, 444 U.S. 11, 19, 100 S.Ct. 242, 246–47, 62 L.Ed.2d 146 (1979); *Leland v. Moran*, 235 F.Supp.2d 153, 171–72 (N.D.N.Y. 2002), *aff'd*, 80 Fed.Appx. 133 (2d Cir. 2003); *Save Our Summers v. Wash. State Dep't of Ecology*, 132 F.Supp.2d 896, 911 (E.D.Wash.1999); *Corren v. New York Univ.*, No. 86 Civ. 7199, 1989 WL 85860, at *3 (S.D.N.Y. July 26, 1989); *Garcia v. Cecos Int'l, Inc.*, 761 F.2d 76, 82 (1st Cir. 1985).

Plaintiffs here have failed to carry their burden of proving that jurisdiction exists over their Clean Air Act claims. As both sides concede, plaintiffs' Clean Air Act claims cannot be brought pursuant to the Citizen Suit provision because defendants' creation and implementation of the AIM Regulations does not constitute an actionable activity under the Citizen Suit provision; plaintiffs must therefore look elsewhere to establish jurisdiction. *See* 42 U.S.C. § 7604(f)(1)-(3); *see also Council of Commuter Orgs. v. Metro. Transp. Auth.*, 683 F.2d 663, 670 (2d Cir.1982).

Similarly, plaintiffs' § 1983 argument fails to demonstrate the existence of jurisdiction. Although the Clean Air Act's savings clause [6] provides plaintiffs with the opportunity to seek relief for violations of their statutory or common law rights, the Clean Air Act's comprehensive remedial scheme precludes plaintiffs' § 1983 claims. *See Leland*, 235 F.Supp.2d at 171–72; *Save Our Summers*, 132 F.Supp.2d at 911; *Meghrig v. KFC Western Inc.*, 516 U.S. 479, 487–88, 116 S.Ct. 1251, 1256, 134 L.Ed.2d 121 (1996). Additionally, in order to utilize the savings clause, a private cause of action must be derived from a separate statute, not the Clean Air Act's

---

**6.** The Clean Air Act's savings clause states that "nothing in this section shall restrict any right which any person (or class of persons) may have under any statute or common law to seek enforcement of any emission standard or limitation or to seek any other relief (including relief against the Administrator or a State agency)." 42 U.S.C. § 7604(e).

procedural provisions. *Nat'l Sea Clammers Ass'n,* 453 U.S. at 15–16, 101 S.Ct. at 2623–24.

In light of the Clean Air Act's comprehensive remedial scheme and in lieu of the Clean Air Act creating any federal rights, plaintiffs' assertion that jurisdiction arises under § 1983 is insufficient to confer subject matter jurisdiction. Defendants' motion to dismiss plaintiffs' Clean Air Act and § 1983 claims must be granted.[7]

**B. *Failure to State a Claim—Commerce Clause, Equal Protection Clause, and Section 1983 Claims***

**1. *Standard***

■ In deciding a motion to dismiss pursuant to Fed.R.Civ.P. 12(b)(6), "a court must accept the allegations contained in the complaint as true, and draw all reasonable inferences in favor of the non-movant; it should not dismiss the complaint unless it appears beyond doubt that the plaintiff can prove no set of facts in support of his claim which would entitle him to relief." *Sheppard v. Beerman,* 18 F.3d 147, 150 (2d Cir.1994) (internal quotations omitted). However, conclusory allegations that merely state the general legal conclusions necessary to prevail on the merits and are unsupported by factual averments will not be accepted as true. *See, e.g., Albert v. Carovano,* 851 F.2d 561, 572 (2d Cir.1988); *Clapp v. Greene,* 743 F.Supp. 273, 276 (S.D.N.Y.1990), *aff'd,* 930 F.2d 912 (2d Cir. 1991).

**2. *Commerce Clause Claim***

■ Defendants argue that the New York AIM Regulations do not discriminate against out-of-state manufacturers or favor the interests of in-state manufacturers.

Rather, they argue that the regulations serve a legitimate governmental purpose of protecting the public health and safety of citizens and the environment. Plaintiffs counter this argument by stating that the Commerce Clause is violated because an unreasonable burden is placed on interstate commerce and out-of-state manufacturers, in light of any local benefits that may be received by the State of New York.

In order to state a claim for violation of the Commerce Clause, plaintiffs must allege that the burden on interstate commerce is excessive and not incidental to the local benefits the State of New York receives from its AIM Regulations. *See Pike v. Bruce Church, Inc.,* 397 U.S. 137, 142, 90 S.Ct. 844, 847, 25 L.Ed.2d 174 (1970). Plaintiffs claim that New York's AIM Regulations are an excessive burden because the (1) volatile organic compound limits are not technically feasible; (2) volatile organic compound limits are stricter than the federal standards and standards from many other states; (3) New York AIM Regulations place a financial and administrative burden on defendants that outweighs the benefits received by New York; (4) small manufacturer exemption is a protectionist measure that illustrates defendants' preference for small, in-state manufacturers; (5) alternative standards exist that would not burden interstate commerce; and (6) New York AIM Regulations impede the marketing of plaintiffs' goods in New York State and the interstate marketplace in general.

Because plaintiffs have sufficiently alleged that an excessive, and not incidental, burden is being placed on out-of-state manufacturers, defendants' motion to dismiss for failure to state a claim for which relief can be granted must be denied.[8]

---

**7.** The § 1983 claim will be dismissed to the extent that it asserts an independent cause of action based upon a legal right rooted in the Clean Air Act.

**8.** The § 1983 claim, to the extent that it as-

### 3. *Equal Protection Clause Claim*

██ Defendants assert that plaintiffs do not state a claim for violation of the Equal Protection Clause because the exemptions to the AIM Regulations are temporary, and the temporary distinction between large and small businesses is rationally related to a legitimate governmental purpose (protecting the public health and safety of its citizens and environment). Plaintiffs contend that defendants lack a rationally related governmental purpose.

██ The Equal Protection Clause of the Fourteenth Amendment provides that "[no state] shall deny to any person within its jurisdiction the equal protection of the laws." U.S. Const. amend. XIV, § 1. Courts have interpreted this to mean that similarly situated persons should be treated alike. *City of Cleburne, Texas v. Cleburne Living Ctr., Inc.,* 473 U.S. 432, 439, 105 S.Ct. 3249, 3254, 87 L.Ed.2d 313 (1985); *Plyler v. Doe,* 457 U.S. 202, 216, 102 S.Ct. 2382, 2394, 72 L.Ed.2d 786 (1982). In order for a plaintiff to state a claim under the Equal Protection Clause, she must allege that the classification of individuals is arbitrary, capricious, and lacks a reasonably related governmental purpose. *Bankers Life & Casualty Co. v. Crenshaw,* 486 U.S. 71, 81–84, 108 S.Ct. 1645, 1652–53, 100 L.Ed.2d 62 (1988); *Plyler,* 457 U.S. at 216, 102 S.Ct. at 2394 (noting that unless the classification is suspect, the state must only show that the classification "bears some fair relationship to a legitimate public purpose").

Plaintiffs' complaint alleges that they are treated differently than similarly situated companies because of their classification as large, out-of state manufacturers. While the New York AIM Regulations do not contain an explicit classification of manufacturers by size, plaintiffs' claim that the small manufacturer's exemption results in the classification and exclusion of manufacturers who produce more than 3,000,000 gallons of product a year. They further allege that this classification is arbitrary and capricious. To dismiss plaintiffs' equal protection claim would require a finding of undisputed facts showing that no classification exists; this has not occurred.

Because plaintiffs have met the threshold pleading requirements of an Equal Protection Clause claim, defendants' motion to dismiss for failure to state an equal protection claim must also be denied.[9]

### 4. *Eleventh Amendment Immunity— State Law Claims*

██ Defendants argue that Eleventh Amendment immunity bars plaintiffs from bringing their state law claims against defendants. Plaintiffs assert that defendants' sovereign immunity is negated because Crotty acted *ultra vires* when she committed the State of New York to the Northeast Commission AIM Model Rules "in advance of the state rulemaking process." (Pltfs.' Mem. L. at 3.) No *ultra vires* acts are alleged against Spitzer.

██ The Eleventh Amendment states that "[t]he Judicial power of the United States shall not be construed to extend to any suit in law or equity, commenced or prosecuted against one of the United States by Citizens of another State, or by Citizens or Subjects of any Foreign State." It thereby grants sovereign immunity to states that have not unequivocally consent-

---

serts an independent cause of action based upon a legal right rooted in the Commerce Clause, will not be dismissed.

9. The § 1983 claim, to the extent that it asserts an independent cause of action based upon a legal right rooted in the Equal Protection Clause, will not be dismissed.

ed to being sued in federal court and have not had their Eleventh Amendment immunity abrogated by Congress. *See Seminole Tribe v. Florida*, 517 U.S. 44, 54, 116 S.Ct. 1114, 1122, 134 L.Ed.2d 252 (1996); *Green v. Mansour*, 474 U.S. 64, 68, 106 S.Ct. 423, 426, 88 L.Ed.2d 371 (1985).

State officials and agencies cannot be sued for a violation of state law(s) in federal court or sued in their official capacities when the state may be financially liable. *Pennhurst State Sch. & Hosp. v. Halderman*, 465 U.S. 89, 102, 104 S.Ct. 900, 909, 79 L.Ed.2d 67 (1984); *Burnette v. Carothers*, 192 F.3d 52, 56–57 (2d Cir.1999); *Zaire v. Barringer*, No. 9:01–CV–1865, 2003 WL 57918, at *2 (N.D.N.Y. 2003). Sovereign immunity does not apply to state officials who, in the course of acting in their official capacities, have violated federal law. *Ex Parte Young*, 209 U.S. 123, 159–60, 28 S.Ct. 441, 454, 52 L.Ed. 714 (1908). Sovereign immunity also does not apply to state officials who have acted *ultra vires* or "without any authority whatever." *Florida Dep't of State v. Treasure Salvors, Inc.*, 458 U.S. 670, 697, 102 S.Ct. 3304, 3321, 73 L.Ed.2d 1057 (1982).

There is no allegation that defendants consent to being sued or that Congress intended to abrogate defendants' sovereign immunity. Plaintiffs argue for the application of the *Ex Parte Young–Treasure Salvors* exception. Obviously, the state law claims assert that defendant violated state law and not federal law. Therefore, in order for the exception to apply, plaintiffs must establish that Crotty acted "without any authority whatever" under state law. *See id.* Crotty acted as a state official under state law. The creation and implementation of the New York AIM Regulations was well within the scope of her authority. *See* N.Y. Envtl. Conserv. Law §§ 19–0301, 19–0305. Plaintiffs can-

not negate sovereign immunity by bringing into doubt whether Crotty properly followed state mandates or used her authority correctly. As *Larson v. Domestic & Foreign Commerce Corp.* states, an *ultra vires* claim rests on "the officer's lack of delegated power. A claim of error in the exercise of that power is therefore not sufficient." 337 U.S. 682, 690, 69 S.Ct. 1457, 1461, 93 L.Ed. 1628 (1949); *see also Local 851 of the Int'l Bhd. of Teamsters v. Thyssen Haniel Logistics, Inc.*, 90 F.Supp.2d 237, 243 (E.D.N.Y.2000). Crotty did not act *ultra vires* or "without any authority whatever."

Eleventh Amendment immunity bars plaintiffs' state law claims. Defendants' motion to dismiss those claims will be granted.

## IV. CONCLUSION

The Clean Air Act's comprehensive remedial scheme precludes plaintiffs from bringing their Clean Air Act claims and/or under § 1983. Unlike their Clean Air Act claims, plaintiffs' Commerce Clause claim and/or under § 1983 will not be dismissed because plaintiffs have pled facts, which, if true, set forth that the New York AIM Regulations place an excessive burden on interstate commerce that is not incidental to the local benefits received from implementing the regulations. Plaintiffs' Equal Protection Clause claim and/or under § 1983 will also not be dismissed for failure to state a claim for which relief can be made because plaintiffs' have again alleged facts that the New York AIM Regulations do not have a rationally related government interest and that the resulting classification of manufacturers based on output of product is arbitrary and capricious. Finally, because defendants did not act *ultra vires*, Eleventh Amendment immunity applies to them and bars plaintiffs' state law claims.

Accordingly, it is

ORDERED that

1. Defendants' motion to dismiss plaintiffs' Clean Air Act claim is GRANTED;

2. Defendants' motion to dismiss plaintiffs' § 1983 claim to the extent it alleges violations of the Clean Air Act is GRANTED;

3. Defendants' motion to dismiss plaintiffs' Commerce Clause claim is DENIED;

4. Defendants' motion to dismiss plaintiffs' Equal Protection Clause claim is DENIED;

5. Defendants' motion to dismiss plaintiffs' § 1983 claim to the extent it alleges violations under the Commerce Clause and/or Equal Protection Clause is DENIED;

6. Defendants' motion to dismiss plaintiffs' state law claims is GRANTED;

7. Causes of action 3–4 and 6–13 are DISMISSED;

8. Cause of action 5 is DISMISSED to the extent it alleges violations of the Clean Air Act; and

9. Defendants shall file and serve an answer to causes of action 1, 2, and 5 on or before September 4, 2004.

IT IS SO ORDERED.